FILED
2009 Mar-31  PM 05:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| DAWN RICHARDSON and<br>MARSHA BROWN<br>*ex rel.*<br>UNITED STATES OF AMERICA,<br><br>    Plaintiffs,<br><br>v.<br><br>GOLDEN GATE NATIONAL SENIOR<br>CARE LLC d/b/a GOLDEN LIVING,<br>GGNSC HOLDINGS LLC,<br>ASERACARE, INC., and AEGIS<br>THERAPIES, INC.<br><br>    Defendants. | Case No: _____<br><br>**FILED UNDER SEAL**<br>**DO NOT PLACE IN PRESS BOX**<br>**DO NOT ENTER ON PACER**<br><br>**DEMAND FOR JURY** |

## *QUI TAM* COMPLAINT

Plaintiff-Relators Dawn Richardson and Marsha Brown, on behalf of themselves and the United States of America, allege and claim against Golden Gate National Senior Care LLC, doing business as Golden Living, GGNSC Holdings LLC, AseraCare, Inc., and Aegis Therapies, Inc., as follows:

## JURISDICTION AND VENUE

1.      This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33 (the "False Claims Act").  Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.  Jurisdiction is also authorized under 31 U.S.C. § 3732(a).

2.      Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a), because Defendants qualify to do business in the State of Alabama, transact substantial business in the State of Alabama, transact substantial business in this judicial District, and can be found here.

## PARTIES

3.      Golden Gate National Senior Care LLC, doing business as Golden Living, Golden Horizons, and Golden Innovations (Golden Living), is one of the nation's largest providers of Medicare-supported healthcare services for the elderly.  Golden Living owns and operates nursing homes (assisted living facilities and skilled nursing facilities), hospices, and therapy centers and provides out-patient geriatric rehabilitative services and home-health care services.  Golden Living is owned and managed by GGNSC Holdings LLC.  Among the subsidiaries owned and operated by Golden Living is AseraCare, Inc. (AseraCare), a Medicare-certified hospice provider and home health care provider with 82 locations in 19 states, and Aegis Therapies, Inc. (Aegis), a provider of contract geriatric rehabilitative services.

2

4.      Plaintiff-Relator Dawn Richardson is a registered nurse employed at AseraCare. Ms. Richardson has served for 15 years as a Hospice care-giver and manager and began at AseraCare as a nurse in 2002. Since becoming a clinical manager in 2004, Ms. Richardson has become increasingly concerned by intense pressure from corporate management to maintain budgeted enrollment numbers and increase referrals and by implementation of corporate policies designed to avoid Medicare requirements and restrictions by evading regulations. Ms. Richardson has personally reviewed numerous patient documents and conducted in-person patient visits that demonstrate that patients who do not qualify for the Medicare Hospice Benefit have been fraudulently admitted and certified by Defendants and submitted for reimbursement from the Government through Medicare. Ms. Richardson has been instructed by supervisors and corporate managers – and has witnessed the instruction of other nurses – to admit non-qualifying patients, to dump problem patients without regard to qualification, and to aggressively target imminent-death patients in order to deceptively and fraudulently shrink AseraCare's average length of stay and average per-patient expenditure and thus to evade detection of Defendants' fraudulent billing of Medicare and to avoid liability for repayment of funds in excess of allowable Medicare reimbursements.

3

5.     Plaintiff-Relator Marsha Brown is a long-time manager of hospice facilities.   Since 2003 she has acted as Executive Director for one or more AseraCare hospice sites.   She currently serves in that position in AseraCare's Monroeville, Foley, and – until recently – Mobile locations.   Ms. Brown has witnessed both the operation and effects of Defendants' aggressive marketing tactics and quota-setting, including its policy of mandating "synergy" between its nursing home and hospice operations by requiring nursing home patients to be referred to its hospices at specified rates, all of which result in the admission of non-qualifying patients and fraudulent billing of Medicare, Medicaid, or both.   Ms. Brown's experiences have confirmed Defendants' practices of evading Medicare regulations and covering up their fraud by "dumping" patients and recruiting imminent-death patients, permitting Defendants to fraudulently cycle non-qualifying patients through AseraCare and to "pad" statistics to maximize profit and avoid detection.   Additionally, Ms. Brown has direct personal knowledge of Defendants' tactics of fraudulently manipulating the Medicare system for maximum profit by recruiting inappropriate patients for skilled nursing care then referring them to AseraCare Hospice once Medicare reimbursements for their skilled nursing and rehabilitative therapy are exhausted.

6.     Through their experience, Plaintiff-Relators have witnessed so many instances of fraud as to believe that Defendants' false certifications, fraudulent

4

billing, and tactics of evasion are widespread, systematic practices endemic to the Defendants. Defendants' fraudulent practices offend Plaintiff-Relators' long-standing dedication to the mission of hospice care and to the needs of terminally-ill patients and cause them to file this Complaint on behalf of themselves and the United States as original-source relators under the *qui tam* provisions of the False Claims Act. Plaintiff-Relators are serving contemporaneously herewith a statement of the material evidence in their possession upon which their claims are based.

## THE MEDICARE REIMBURSEMENTS IN GENERAL

### I.    The Medicare Hospice Benefit

7.    Defendants' aggressive, profit-maximizing business model represents an intrusion of greed into an institution founded upon philosophical, spiritual, and medical notions of charity and care-giving. The impetus for the modern hospice movement in the United States is attributed to psychiatrist Dr. Elizabeth Kübler Ross, whose 1969 On Death and Dying is acknowledged to have altered modern perceptions about care for the terminally ill. In the 1970s, U.S. hospices opened their doors as volunteer organizations dedicated to bringing comfort and humanity to terminal patients. Testifying in 1975 before the U.S. Senate Special Sub-committee on Aging, Kübler Ross stated: "We should not institutionalize people. We can give families more help with home care and visiting nurses, giving the

5

families and the patients the spiritual, emotional, and financial help in order to facilitate the final care at home." In 1982, Congress created a provisional Medicare Hospice Benefit, made permanent in 1986. By 1990, 800 hospice companies were caring for 76,491 patients, with an average length of stay of 48.4 days.

8.     From such humble altruistic roots, Hospice has become big business. Medicare hospice payments rose from $205 million in 1989 to $9.2 billion in 2006. In 2004, payments to Alabama hospice companies alone amounted to nearly a quarter of a billion dollars. In the 1998 article "Hospice Boom Is Giving Rise to New Fraud," the *New York Times* recognized that the hospice infrastructure "was never designed to handle the expanding network of nursing homes, hospices, assisted-care centers and other services popping up to serve the nation's growing aging population." Venture capitalists and other investors have been quick to perceive that the Medicare Hospice Benefit represents a potentially unlimited stream of income for those who bring aggressive marketing, sales, and growth tactics into the new industry of care for the dying. In particular, Hospice entrepreneurs have targeted nursing homes, whose pools of potential patients offer valuable referral sources and an attractive – though fraudulent – *quid pro quo* for profiteering hospices. By accepting stable, non-qualifying nursing home patients onto their hospice rolls, where their care and supplies are paid for by the

Government through the Medicare Hospice Benefit, hospice companies can boost their own Medicare payments and cover expenses for nursing homes, cementing their symbiotic referral relationship.  Nursing homes, by the same token, are able to cut costs by fraudulently shifting labor and supply costs onto Medicare through the Medicare Hospice Benefit.

9.      Leslie Novak, then Acting Director of the Centers for Medicare & Medicaid Services, testified before the U.S. House of Representatives Committee on Ways and Means in 2007 that "Hospice is not intended to be used as a nursing home."  Nevertheless, Defendants and other for-profit Hospice companies have instituted a fraudulent scheme to treat the Medicare Hospice Benefit as an improper subsidy for general nursing home and in-home care and to capitalize on and aggressively market to the nation's rapidly growing elderly population.

10.     Hospice covers a broad set of palliative services for qualified beneficiaries who have a life expectancy of six months or less as determined by their physician.  Hospice is designed to provide pain relief, comfort, and emotional and spiritual support to patients with a terminal diagnosis.  Qualified hospice patients may receive skilled nursing services, medication for pain and symptom control, physical and occupational therapy, counseling, home health aide and homemaker services, short-term inpatient care, inpatient respite care, and other services for the palliation and management of the terminal illness.  Qualified

beneficiaries who elect the Medicare Hospice Benefit agree to forego curative treatment for their terminal condition.

11.    Through Medicare and/or Medicaid (indirectly through the States), the United States reimburses hospice providers for services to qualified beneficiaries on a *per diem* rate for each day a qualified beneficiary is enrolled.  Medicare and/or Medicaid makes a daily payment, regardless of the amount of services provided on a given day and even on days when no services are provided. Payments are made according to a fee schedule that has four base payment amounts for the four different categories of care: routine home care (RHC), continuous home care (CHC), in-patient respite care (IRC), and general in-patient care (GIC).

12.    The four categories are distinguished by the location and intensity of the services provided and the base payments for each category reflect variation in expected input cost differences.  Specifically, patients who are eligible for IRC and GIC hospice care qualify not only for Medicare reimbursement of in-patient hospice services, but also for federally-funded reimbursement of room and board costs at nursing homes and certain other in-patient facilities.  In such instances, the patient may receive goods and services from the hospice provider that offset the costs to the nursing home of otherwise duplicative goods and services.  If a patient does not qualify for IRC or GIC hospice care but only qualifies for RHC or CHC,

then she may nevertheless receive hospice care while in a nursing home.  However, the nursing home will not receive Medicare reimbursement for nursing home care. In any event, in order for a patient to receive hospice care in a nursing home, the nursing home must have a contract with a Medicare-certified hospice provider.

13.    Unless a hospice company provides CHC, IRC, or GIC on any given day it is paid at the RHC rate.  For any given patient, the type of care can vary throughout the hospice stay as the patient's needs change. The daily payment rates are intended to cover costs that hospice providers incur in furnishing services identified in patients' care plans for patients who have been determined by their physicians to be suffering a terminal illness.

14.    Medicare imposes on hospice providers an annual per-patient average cap for reimbursements (the Aggregate Cap).  The Aggregate Cap is set by CMS according to federal statute, and in 2008 stood at $22,386.13 per patient.[1]  The Aggregate Cap is not related to expenditures on individual patients.  Rather, it limits the aggregate reimbursement a provider may receive from Medicare.  A hospice provider's compliance is calculated by dividing its total submitted reimbursements over a year by the number of non-duplicative patients enrolled during that year.   Thus, every first-time Medicare hospice patient enrolled increases a hospice's Aggregate Cap amount by $22,386.13.

---

[1] *See* 42 U.S.C. 1395f(i).

## II.   Medicare Coverage of Skilled Nursing Care

15.   Medicare offers limited coverage of skilled nursing care for qualifying patients.  According to CMS, the purpose of skilled nursing care is to ameliorate a patient's condition – it is curative care.  In order to qualify for coverage, a patient otherwise appropriate for Medicare must show a qualifying hospital stay of three or more days within the 30 days prior to entering the skilled nursing facility.  A physician must order procedures for the patient that are appropriate to be performed only in a Skilled Nursing Facility (SNF), such as rehabilitative therapy, and must certify that the patient's condition is such that he or she can practically be cared for only in a SNF.  In so certifying, the physician must determine that the patient's condition should improve or achieve stability in response to curative care. The SNF medical staff is required to write a plan of care for each skilled nursing patient based upon the individual's needs and circumstances.   Upon satisfaction of those requirements, Medicare will pay for 100 days of skilled nursing care per-patient, per-illness period – though after the first 20 days a co-payment of 20% is required of the patient.  Once a patient qualifies, Medicare bears all expenses of the SNF, including the patient's custodial care and room and board (custodial care is not otherwise covered by Medicare).  Typically, an SNF receives approximately $650 per day from Medicare for a qualifying skilled nursing patient.

## THE DEFENDANTS' FRAUDULENT SCHEME OF BILLING THE UNITED STATES FOR UNQUALIFIED HOSPICE AND SKILLED NURSING PATIENTS

16.     Under the guise of "synergy," Defendants have implemented a fraudulent scheme to manipulate the Medicare system and maximize their potential profits from each Medicare patient at the expense of the patient and the Medicare system.  Defendants comprise a family of companies operating under the Golden Living/Golden Horizons umbrella and offering a range of Medicare-supported healthcare services to the elderly.  Specifically, Defendants offer skilled nursing care, including therapy services through Aegis, home health care, and Hospice services through AseraCare.  Defendants utilize their various subsidiary operations to recruit and fraudulently enroll elderly patients who are then fraudulently referred between organizations in whatever manner will result in the highest possible Medicare reimbursements, without regard to propriety, qualification, or the individual wellbeing of the patient.

17.     Additionally, since at least 2002, Defendants have defrauded the United States through a systematic pattern and practice in their hospice operations by targeting and enrolling non-terminal patients and fraudulently billing Medicare and/or Medicaid for hospice services to patients who do not qualify for the Medicare Hospice Benefit.  Until around 2006, Defendants' fraud predominantly took the form of the fraudulent certification and re-certification of patients

11

inappropriate for Hospice, which resulted in stable, non-terminal patients remaining on Defendants' rolls for years. Inevitably, however, that practice caused Defendants to run afoul of the Aggregate Cap. Seeking to avoid liability for repayment of Medicare funds in excess of their allowed Aggregate Cap amount, Defendants devised a scheme to cycle non-qualifying patients through their hospice rolls, "dumping" such patients at or near the expiration of six months – regardless of their health status or diagnosis – in order to artificially manipulate the Aggregate Cap and maximize profits. Additionally, perceiving that each enrolled hospice patient allows Defendants to fraudulently bill Medicare an additional $22,386.13, Defendants have mounted an aggressive campaign to enroll imminent-death patients by soliciting "last breath" referrals from their skilled nursing facilities and from oncologists and nephrologists, and to pressure non-terminal patients to enroll temporarily even where patients state that they are doubtful they qualify for Hospice or are unwilling to forgo curative care.

## I.    Defendants' "Synergy" and Skilled Nursing Care Fraud

18.   Defendants' have systematically defrauded the United States through a scheme of manipulating the Medicare system by falsely certifying and fraudulently cross-referring non-eligible skilled nursing and hospice patients within their organization to maximize profits from each form of Medicare reimbursement. Defendants label their scheme "synergy" and require their

marketers and managers to achieve "synergy quotas," which are set with disregard for practical conditions in individual markets.   Under threat of demotion or termination, Defendants employees use high-pressure tactics and outright dissimulation to coerce patients and their families to choose the course of care that most benefits Defendants.   Outrageously, Defendants fraudulently certify dying patients – who should be referred to hospice – for curative skilled nursing care while at the same time fraudulently certifying stable patients – who should be receiving curative or (non-Medicare covered) custodial care – for hospice.

19.   The goal of Defendants' fraudulent "synergy" scheme is to actualize the maximum number of potential Medicare dollars that each patient represents. In doing so, Defendants are prepared to, and do, completely disregard the care, wellbeing, and dignity of the patients, not to mention the requirements of the respective Medicare benefits.   Typically, a patient admitted into Defendants' web of operations will be referred and re-referred until that patient has received – and Medicare has been billed for – the maximum number of days of skilled nursing care, including rehabilitative therapy (which carries its own per-patient cap), home health care, and hospice care.   Under Defendants' scheme a patient who is currently appropriate for hospice and unsuitable for therapeutic treatment will nonetheless be enrolled in Defendants' skilled nursing facility and put through rehabilitative therapy so that Medicare can be billed approximately $15,000.00 for

the patient's therapy and skilled nursing care before the patient is then almost immediately referred to Defendants' hospice and properly given palliative care until his or her death. Conversely, a stable patient may be enrolled in hospice in order to increase Defendants' Aggregate Cap amount, then dropped from hospice and referred to Defendants' skilled nursing facility in order to glean skilled nursing reimbursements, before finally being fraudulently re-certified for hospice in order to cut costs for the nursing home and increase profit for both AseraCare and Golden Living.

20.     At the outset, Defendants look to maximize their number of referrals and potential enrollees by visiting and soliciting areas where the vulnerable Medicare-eligible elderly tend to congregate: Defendants' employees are specifically detailed to patrol hospitals, to go door-to-door in HUD developments, and to ride along with "Meals-on-Wheels" outreach missions – thus abusing other federally-subsidized programs as tools for Defendants' target marketing and market segmentation.

21.     Defendants train their employees in tactics of coercion. Employees are taught to obfuscate and dissemble the nature of the Medicare benefit programs into which patients are to be enrolled and instead to take advantage of the misfortune of a given patient's circumstance. Defendants' marketers and admissions personnel are specifically taught to enroll patients by appealing to their

vulnerabilities and promising them whatever they need. Defendants' training manuals teach marketing employees to apply the following "Words of Wisdom"—

**"Effective communication is the _transfer of emotion, not information_."**

22.    Frequently Defendants find their patients in hospitals – since a skilled nursing care enrollee must have a qualifying hospital stay. Employees of Defendants' are taught to scan discharge rolls for potential referrals. Once a potentially "skillable" patient is identified, the employee is expected to convince the family that skilled nursing care in a Golden Living SNF is the best option even when it is not. Defendants' employees are expected to "skill" patients regardless of propriety or qualification, often by concealing material information and focusing on (at least apparent) financial necessity. For example, it commonly occurs that Defendants' personnel patrolling hospitals identify patients who are either (1) in need of custodial but not skilled nursing care or (2) unsuited for therapeutic care or curative care in general but eligible for hospice. Often such patient's families do not have the resources to pay privately for custodial care. In such circumstances, Defendants' personnel are expected to convince the family to enroll the patient into a Golden Living SNF by downplaying the requirements for that benefit and by avoiding the topic of hospice and focusing instead on the financial reality that the patient needs custodial care, that the family cannot pay, and that custodial care will be covered for 20 days by Medicare (if the patient is fraudulently enrolled as a

15

skilled nursing patient).  The patient is thus "skilled" even though he or she does not qualify for skilled nursing care and, in many instances, is not suitable for curative care at all.  In fact, Plaintiff-Relators are aware of numerous instances in which Golden Living employees have ignored a physician's order for admitting a patient to hospice and instead "skilled" such patient upon his arrival at the Golden Living SNF to glean the additional Medicare reimbursements for skilled care.  In other words, the dying patient is put through rehabilitative therapy and denied palliative care so that Golden Living and Aegis can boost enrollment and profit. Defendants have nothing to lose and everything to gain by such tactics since they can, and do, immediately refer the patient to AseraCare once the Medicare-funded skilled nursing days are exhausted, resulting in benefit for both Defendants' hospice and nursing home operations. Defendants blatantly disregard the wellbeing of the patient and the requirements for Medicare reimbursement in order to fraudulently maximize their Medicare billing.

23.   In fact, as part of Defendants' "synergy program," AseraCare and Golden Living managers are required to maintain a strict quota of referrals from nursing home to hospice.  Almost never – Plaintiff-Relators can identify fewer than five instances in their combined 14 years of experience – is a SNF patient referred to hospice before after her "skilled" days are exhausted.  Plaintiff-Relators are frequently told by Golden Living managers that SNF patients will soon be on their

twentieth day of skilled care and will *then* be referred to AseraCare.  In essence, Defendants bill Medicare for a patient's curative therapeutic care up until the twenty-first day when such patients are abruptly determined to be dying and are referred to hospice for purely palliative care.  Such determinations are made solely according to Defendants' goal of profit-maximization with complete disregard for patient welfare and diagnosis.

24.     The fraudulent "synergy" scheme works the other way as well.  While touring the HUD developments and riding with Meals-on-Wheels, AseraCare employees identify patients in need of elder care.  As described more fully below, AseraCare employees are trained to market hospice services to these patients regardless of qualification and to admit these patients to hospice.   Again, Defendants' employees overcome patient trepidation by appealing to the needs of the patients and obfuscating the true nature of hospice care by offering what appears to be Government-paid in-home custodial care.  Defendants exploit the individual fears and requirements of patients, using such tactics as enticing patients with badly-needed services but telling them they have only minutes to decide. Ideally for Defendants, such patients will be enrolled in hospice despite ineligibility, then be discharged from Hospice and referred to a Golden Living SNF and finally re-referred to hospice once their Medicare-funded "skilled" days are exhausted.  This provides Defendants the benefit of increasing their Aggregate Cap

17

amount, boosting profits for skilled nursing, and maintaining a high percentage of "synergy" referrals.

25.     When such a patient is referred to Hospice while still in the SNF, the nursing home is able to defray numerous costs to Medicare through improper billing of the Medicare Hospice Benefit. Defendants' nursing homes – and other nursing homes with which AseraCare fraudulently deals – are able to cut the costs of providing patient care and room and board.  Costs of goods such as adult diapers and other disposable items which would otherwise be a financial liability of the nursing home are borne by AseraCare and, ultimately, by the United States through fraudulent Medicare billing.  Additionally, the cost of nursing services is shared between the nursing home and the hospice provider, both of whom can provide less nursing care to the patient which effectively cuts the cost for both the nursing home and the hospice provider – resulting in a higher profit margin for both.  In fact, once an SNF has several AseraCare Hospice patients, AseraCare promises to place a full-time employee in the SNF.  The nursing home thus receives an inappropriate subsidy from the Medicare Hospice Benefit in exchange for providing a ready source of referrals for AserraCare.  In some circumstances nursing homes have a particular incentive to refer certain patients for admission to hospice care because Medicare and Medicaid will pay not only for the hospice

services but also provide a guaranteed source of revenue for the nursing home in the form of reimbursement for the patient's room and board.

26.     The pool of patients at Defendants' nursing homes provides a ready means for AseraCare to cycle non-qualifying (but plausible) patients through its hospice rolls.   Defendants' marketers and supervisors make frequent use of "synergy" in attempting to meet the referral and admission quotas imposed by Defendants.   AseraCare marketers and nurses routinely glean their last few necessary patients from Defendants' nursing home populations, disregarding the patients' non-qualification for the Medicare Hospice Benefit.

## II.     Defendants' Hospice Fraud

27.     Defendants' conduct a hospice operation designed to defraud Medicare, Medicaid, or both, by cycling non-qualifying patients through their hospice while manipulating their Aggregate Cap statistics through recruitment of "last breath" patients on the brink of death as well as non-qualifying patients who are coerced into enrolling in Defendants' Hospice program despite their stable condition and unwillingness to forgo curative treatment.   Thereafter, such patients are "dumped" from AsceraCare at or near the expiration of six months so that the fraudulent admission cannot be detected.

**(a) Fraudulently marketing to and admitting non-qualifying Hospice Patients.**

28.     Defendants' fraudulent scheme of admitting and improperly billing the United States through the Medicare Hospice Benefit is implemented through their aggressive marketing plan.  Defendants market their hospice services directly to potential patients, their families, and physicians through registered nurses and non-nurse, non-medically-trained Provider Relations Managers (PRMs). Defendants task the PRMs with appeasing patient referral sources and soliciting patient referrals.  PRMs are compensated in direct proportion to the number of patients admitted and billed to Medicare for Hospice treatment and are routinely terminated if they fail to meet their monthly targeted number of referrals.  As described above, PRMs and nurses are frequently tasked with patrolling locations in which particularly vulnerable Medicare-eligible elderly patients might be found, such as HUD developments and Meals-on-Wheels programs.

29.     Effective marketers are rewarded and promoted without regard to any other consideration.   For example, in early 2009, Laurie Colyer, a top-performing PRM, was caught violating company policy by illicitly reviewing personnel compensation records.  Although Ms. Colyer's violation – which would ordinarily result in dismissal – was known by AseraCare management and human resources, Ms. Colyer was not disciplined but rather ultimately received a promotion because she had met her "synergy goal" and other marketing goals.  The indisputable

message to AseraCare marketers and nurses is that nothing matters more than meeting the numbers and that ethical considerations yield to boosting profits.

30.    Intense pressure is placed upon managers, marketing personnel, and nurses responsible for admissions.  Plaintiff-Relators and all AseraCare personnel are constantly reminded of periodic quotas for admissions and synergy goals. Defendants' supervisors and marketers are required to meet several times a week to report on their individual efforts to admit new patients.  Hospice managers are instructed to meet with nursing home managers to promote "synergy" by directly manipulating patients' care plans to maximize the billing to the United States through Medicare, rather than to promote the most beneficial plan of care to the patient.

31.    Defendants' nurses who are responsible for admissions are relentlessly pressured to admit patients and constantly instructed to enroll any patient who is even plausibly qualified.  Defendants instruct their employees to "look for gray areas" and "dig deeper" to admit such patients regardless of whether they actually qualify for the Medicare Hospice Benefit.  Defendants' training materials specifically instruct employees to "advocate" that patients and families elect hospice while avoiding the "transfer of information" or anything that might offer families and patients a true "choice."  Employees are to "listen for the yes." The stated goal of management at AseraCare is: "Getting over 'not ready yet.'"

AseraCare Hospice employees are specifically taught by management to tell reluctant potential patients: "While you're thinking about it" enroll in hospice "just for a few days." Such marketing tactics are heralded in Defendants' training materials without even passing mention of or reference to the qualifications and criteria for the Medicare Hospice Benefit.

32.     Employees who fail to admit "gray area" patients, reluctant patients, or even clearly non-qualifying patients are threatened with termination. Employees who meet with potential patients and families for "info-only" sessions rather than converting the patient to enrollment in hospice are demoted to "2nd class status" for lowering the Defendants' "conversion rate." The unmistakable message to Defendants' employees is that any referral that fails to result in enrollment in AseraCare is a "*Compromised mission.*"

33.     For example, as early as 2006, Plaintiff-Relator Richardson was instructed by supervisors Tracie Carpenter (Carpenter) and Tammy Jemison (Jemison) to recertify a certain patient admitted under the diagnosis of "dementia," which under certain circumstances may justify reimbursement under the Medicare Hospice Benefit. The patient, however, did not display the necessary symptoms or history to justify continued enrollment under "dementia" because she was able to ambulate unaided and regularly carried on full conversations with staff. When Ms. Richardson expressed reluctance to recertify the patient and explained that the

patient did not qualify for the Medicare Hospice Benefit, she was threatened with termination by Carpenter and Jemison, who asked: "What would [that patient] do if you weren't able to come to see her?"  Nurses are invariably instructed to stretch the definitions of diagnosable conditions in favor of enrollment and are told: "Put them on [Hopsice] and watch them for a while [to determine whether they qualify]."  When AseraCare nurse Stephanie King told Carpenter that she was troubled by the admission of patients that did not qualify, Carpenter recited to her AceraCare's mantra: "Just admit them and watch them."

### (b) Defendants' Tactics of Disguising Non-Qualifying Hospice Patients

34.    Defendants deliberately train their personnel in the craft of fraudulently admitting non-qualifying patients for billing to the United States under the Medicare Hospice Benefit.  Although Medicare regulations require certification by physicians prior to Hospice admission, Defendants' operations are such that discretion is invariably left to nurses, who then submit the paperwork for the signature of an M.D. *in absentia* without a direct examination of the admitted Hospice patient.  Accordingly, Defendants' nurses have *de facto* authority to admit patients and are pressured to do so.

35.    Defendants instruct their nurses, in setting out the basis for Hospice qualification, to simply copy the language of the CMS Local Criteria Documentation (LCD) rather than to attempt to describe the actual condition of the

individual patient.   Thus, the patient appears qualified for Medicare for record

purposes whether or not he or she in fact has a legitimate terminal prognosis –

which many of the patients certified by Defendants and billed to the Medicare

Hospice program do not.   Accordingly, a review of Defendants' hospice patients'

charts would indicate that "on paper" the patient is qualified; however, in-person

patient examinations by Ms. Richardson and others belie the falsified written

descriptions and fraudulent diagnoses.   Defendants are aware that Government

audits routinely consist of chart reviews and that it would be impractical and

unlikely for the Government to undergo actual in-person patient reviews rather

than a random audit of patient charts.

### (c) Defendants' Scheme of "Dumping" Non-Qualifying Patients to Avoid Detection and Fraudulently Decrease their Repayments to the United States for Exceeding the Aggregate Cap.

36.   Defendants know that their above-described practices directly result in

admission of non-qualifying patients.   In fact, as a result of their practices,

AseraCare has frequently run afoul of the Aggregate Cap and been forced to

reimburse Medicare for overpayments.   As a result, Defendants have adopted

practices designed to maximize profits by boosting their enrollments, increasing

their Aggregate Cap amounts and decreasing average length of stay.   Defendants

accomplish this by fraudulently certifying non-qualifying patients then "dumping"

them at or before six months.   Additionally, Defendants frequently "dump"

24

patients to avoid excessive lengths of stay regardless of qualification, in order to avoid reimbursing Medicare for overpayments under the Aggregate Cap. Defendants label this "census management."

37.    Defendants' scheme is deliberate and systematic.  In 2007, Plaintiff-Relator Brown was appointed Executive Director of AseraCare's Mobile office. At that time, the Mobile location had a "census" of 84 patients, more than half of whom were non-qualifying and had been fraudulently billed to the United States under the Medicare Hospice Benefit.   Ms. Brown was told that corporate management knew about the non-qualifying patients and that so many non-qualifying patients had been enrolled that the Mobile office had a "Cap problem." She was instructed to immediately "dump" the fraudulent enrollees, which shrunk the census from 84 to 40.

38.    In 2008, however, Ms. Brown was replaced by Terry Tate as Executive Director in Mobile.  The week after Ms. Brown's departure, the site enrolled 14 patients and currently has an enrollment of around 65 patients – a 60% increase from Ms. Brown's tenure.  Many of the patients added to the rolls were referral patients previously rejected by Ms. Brown as non-qualifying.  In fact, Tate and Regional Sales Director Angie Thornton went down the rolls of patients denied admission by Ms. Brown, calling the family of each patient and marketing Defendants' hospice services to them and convincing them that the patient now

25

met criteria for the Medicare Hospice Benefit.   Upon information and belief, over 50% of AseraCare Mobile's current census is inappropriate for hospice and have been fraudulently certified and billed to the Government under the Medicare Hospice Benefit.

39.   Defendants avoid detection by "dumping" long length of stay patients. During the three month period immediately prior to the filing of this Complaint, Mobile Executive Director Terry Tate – the same AseraCare official who had raised Mobile's census 30% in one week by enrolling previously discharged patients – ordered Plaintiff-Relator Richardson to "dump" all patients under her authority with lengths of stay longer than 180 days regardless of their actual medical condition or prognosis to avoid Aggregate Cap exposure.

40.   Upon information and belief, a significant percentage of all of Defendants' claims for payment to the United States through Medicare and Medicaid are for patients who do not have a genuine diagnosis of terminal illness and who do not qualify for Hospice.  In order to cover-up their fraud, Defendants simply copy the LCD information onto the admission documents regardless of whether the criteria actually reflect the patients' condition and diagnosis, then "dump" such patients within a six month period.  Defendants' certify patients for hospice as having six months or less to live; yet an inexplicably high percentage of Defendants' patients are actually healed or stabilized within six months, despite

having foregone all curative care.   A review of Defendants' percentage of "live discharges" belies a reasonable terminal diagnosis for such patients.   The charts below represent the percentages of live discharges – patients were admitted with prognoses of less than six months to live yet were discharged from AseraCare service alive –   by year in the areas of Defendants' market where Plaintiff-Relators' are employed:

| Monroeville, Alabama | |
|---|---|
| Year | Percentage of Live Discharges |
| 2005 | 38.7% |
| 2006 | 42.1% |
| 2007 | 48.1% |
| 2008 | 35.5% |
| 2009 | 48.4% |

| Foley, Alabama | |
|---|---|
| Year | Percentage of Live Discharges |
| 2005 | 44.4% |
| 2006 | 49% |

| 2007 | 59.2% |
|------|-------|
| 2008 | 42.4% |
| 2009 | 46.7% |

| Mobile, Alabama | |
|------|-------|
| Year* | Percentage of Live Discharges |
| 2007 | 69.9% |
| 2008 | 61.8% |
| 2009 | 78.6% |
| *At the time of filing of this Complaint information earlier than 2007 was not available for AseraCare's Mobile, Alabama location. | |

41.    It is hardly plausible that such a high percentage of Defendants'
hospice enrollees would be discharged alive unless such patients were non-
terminal and fraudulently enrolled from the outset.  As demonstrated by the charts
above, between 35.5% and 78.6% of AseraCare's discharged patients were non-
terminal in south Alabama between 2005 and early 2009.  Moreover, the charts
demonstrate that AseraCare's percentages of live discharges has steadily and
sharply increased since 2005 as Defendants' have aggressively attempted to
"dump" AseraCare's fraudulently-enrolled non-terminal patients in order to

28

decrease its obligation to repay the United States for overpayments as a result of its "Cap Problem."

42.     As discussed *supra*, the Hospice benefit was intended to provide palliative care to patients who have been diagnosed with six months or less to live. Yet, a shockingly high percentages of AseraCare's patients do not die in six months but rather are discharged alive.   Defendants' fraudulent scheme of enrolling and billing for non-qualifying patients is the inescapable explanation for such high percentages of live discharges.  Defendants routinely fraudulently enroll unqualified patients despite the lack of terminal diagnosis or documentation of terminal illness, "dump" those patients after six months, then replace them with new unqualified patients (often from their nursing home rolls), thus disguising their fraud while increasing their total number of enrollments and their Aggregate Cap amount while maintaining a high "census."   Documentation and ongoing observation and examination by Defendants' employees, including Ms. Richardson and others, routinely reveals that a high percentage of the patients that AseraCare bills to the United States via the Medicare Hospice Benefit are in stable and non-terminal condition.

**(d) Defendants' Scheme of Aggressively Recruiting "Last Breath" Patients To Artificially Increase the Aggregate Cap and Shrink the Average Length of Stay.**

43.     Defendants   further   cover-up   their   fraudulent   non-qualifying admissions and fraudulently decrease their obligation to repay the United States for Aggregate Cap overpayments by aggressively recruiting "last breath" patients who boost aggregate enrollments without raising reimbursements – effectively lowering AseraCare's average per-patient expenditure.   By cycling non-qualifying patients through their rolls and manipulating statistics to disguise their fraud and increase their Aggregate Cap, AseraCare fraudulently bills the United States through the Medicare Hospice Benefit to the greatest extent possible.

44.     In sites where Defendants' hospices are experiencing a "Cap problem," Defendants instruct their employees to elicit referrals from sources likely to have patients nearing death and to specifically request that such referrals be made at the time of the potential patient's "last breath" – mere days or even hours from dying.   Employees are advised to explain to referral sources that Defendants are willing to "wait patiently" for referrals until the referring sources have maximized their own profit from the patient, thus creating a symbiotic benefit for both parties.   Defendants' sole goal and motivation in soliciting such admissions is the salutary effect they have upon Defendants' Aggregate Cap numbers.  Defendants delay enrolling such patients until the last possible moment in order to minimize any actual Medicare-reimbursable care given to such patients and thereby maximize the surplus Aggregate Cap boost that having the patient's

name on their rolls gives Defendants.   While such patients technically are appropriate for hospice and qualify for the Medicare Hospice Benefit, Defendants' targeting of such patients and deliberately delaying their enrollment until their "last breath" with the purpose of "padding" statistics and "managing census" constitutes fraudulent manipulation of the Aggregate Cap.  Defendants' scheme is designed and intended to reduce AseraCare's liability for repayment to the Government and to disguise AseraCare's fraudulent admission of and billing for other patients who do not qualify for the Medicare Hospice Benefit.   Essentially, Defendants' fraudulent scheme is to use such legitimately qualified "last breath" patients to cover-up their fraudulent admission and billing for non-qualifying patients, deceptively shrinking their average length of stay and raising their Aggregate Cap. The disturbing result of this aspect of Defendants' fraud is that legitimate hospice patients are deliberately denied palliative care until the last hours or days of their lives.

45.    In furtherance of this scheme, AseraCare instructs its nurses, nurse supervisors, and marketers to develop practices for identifying and aggressively recruiting such "last breath" patients through "synergy" referrals of Defendants' Golden Living skilled nursing patients and Aegis rehabilitative therapy patients. By cycling patients in this way, Defendants fraudulently bill Medicare for skilled nursing and rehabilitative therapy until the patient is on her "last breath," when the

patient is referred to hospice to further AseraCare's artificial manipulation of the Aggregate Cap, fraudulently avoid AseraCare's obligation for repayments to the United States, and cover-up AseraCare's fraudulent billing of the United States for other patients who are not terminal and do not qualify for the Medicare Hospice Benefit.

46.    On March 6, 2009, AseraCare Vice President of Sales Jeff Bowling (Bowling) advised Plaintiff-Relator Brown that she needed to enroll more short length of stay patients and advised her to solicit oncologists for "last breath" referrals.    Bowling advised that, in order to ingratiate AseraCare with the oncologists, Ms. Brown should not attempt to persuade them that patients should abandon chemotherapy for palliative care – which might cut into the oncologists' profits – but should rather solicit the doctors to refer their patients to AseraCare in the last few days of their lives.  In that way the oncologists could maximize profits and AseraCare could maximize "last breath" referrals and – by increasing the denominator of the Aggregate Cap equation – allowable Medicare reimbursements. Under Defendants' scheme, oncologists are encouraged by Defendants to impose on cancer patients the horrific effects of aggressive chemotherapy until the patients are on the verge of death – days or even hours from death and far past legitimate hope of a cure – and then to refer the almost-dead patients to AseraCare for enrollment for the sole purpose of shrinking AseraCare's average length of stay

and fraudulently increasing its Aggregate Cap amount, thereby disguising AseraCare's fraudulent admission of other non-qualifying patients.

47.     By and through all of the circumstances described, *supra*, Defendants have undermined the noble intention and mission of Hospice, defrauded the United States, and jeopardized the already overly strained Medicare program.

**COUNT ONE**
**31 U.S.C. § 3729(a)(1) and 3729(a)(2)**
**FALSE CLAIMS FOR NON-QUALIFYING HOSPICE PATIENTS**

48.     Plaintiff-Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

49.     Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States a false or fraudulent claim for payment or approval, to wit: Defendants knowingly certified and/or re-certified Hospice patients whom they knew did not qualify for Medicare or Medicaid reimbursement and presented or caused to be presented false claims to the United States through Medicare or Medicaid for payment of same.

50.     Defendants' fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to be submitted false claims to the United States through fraudulent certification and re-certification of Hospice patients and fraudulent billing of the United States through Medicare or Medicaid.

51.   By and through the actions described *supra*, Defendants knowingly made, used, or caused to be made or used, false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid.

52.   Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendants by the United States through Medicare and Medicaid for such false or fraudulent claims.

WHEREFORE, Plaintiff-Relators demand judgment in their favor on behalf of the United States, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relators may be entitled.

## COUNT TWO
### 31 U.S.C. § 3729(a)(7)
### REVERSE FALSE CLAIMS FOR ARTIFICIALLY INFLATING ASERACARE'S AGGREGATE CAP AND FRAUDULENTLY DECREASING DEFENDANTS' OBLIGATION TO REPAY MEDICARE OVERPAYMENTS TO THE UNITED STATES

53.   Plaintiff-Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

54.   Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease obligations to pay or

transmit money or property to the Government, to wit: Defendants knowingly marketed, recruited, and certified "last breath" hospice patients for the sole purpose of artificially increasing the Aggregate Cap in order to decrease their obligation to repay the United States for overpayments under the Medicare Hospice Benefit.

55.   Defendants' certifications of such "last breath" patients is false in that Defendants did not intend to – and in fact – did not provide the full scope of palliative services to such patients, but rather enrolled such patients at the last possible moment to the patient's detriment and only for the Defendants' profit through manipulation of the Aggregate Cap and a corresponding decrease of their obligations to the United States.

56.   Likewise, Defendants marketed, recruited, and certified non-terminal, non-qualifying hospice patients to enroll "for a few days" for the same purpose of artificially inflating the denominator of the Aggregate Cap and decreasing their obligation for submitting repayments to the United States.

50.   Defendants' fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to be submitted false records or statements to inflate the denominator of the Aggregate Cap in order to avoid repayments to the United States pursuant to 42 USC § 1395f.

52.   Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount of repayments that would have been due to the United States under 42 USC § 1395f but for Defendants' fraudulent manipulation of the Aggregate Cap.

WHEREFORE, Plaintiff-Relators demand judgment in their favor on behalf of the United States, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relators may be entitled.

### COUNT THREE
### 31 U.S.C. § 3729(a)(1) and (a)(2)
### FALSE CLAIMS FOR NON-QUALIFYING SKILLED NURSING PATIENTS

49.   Plaintiff-Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

50.   Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States a false or fraudulent claim for payment or approval, to wit:  Defendants knowingly certified and enrolled patients for skilled nursing care and fraudulently planned and ordered skilled nursing care for patient whom they knew did not require such care and did not qualify for Medicare or Medicaid reimbursable skilled nursing care, and presented or caused to be

presented false claims to the United States through Medicare or Medicaid for payment of same.

51.    Defendants' fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to be submitted false claims to the United States through fraudulent enrollment of non-qualifying skilled nursing care patients and fraudulent billing of the United States through Medicare or Medicaid.

52.    By and through the actions described *supra*, Defendants knowingly made, used, or caused to be made or used, false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid.

53.    Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendants by the United States through Medicare and Medicaid for such false or fraudulent claims.

WHEREFORE, Plaintiff-Relators demand judgment in their favor on behalf of the United States, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relators may be entitled.

## COUNT FOUR
## 31 U.S.C. § 3729(a)(3)
## CONSPIRACY

54. Plaintiff-Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

55. Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States Government, false or fraudulent claims for payment or approval, to-wit: Defendants knowingly certified and/or re-certified Hospice patients whom they knew did not qualify for Medicare or Medicaid reimbursement and presented or caused to be presented false claims to the United States through Medicare or Medicaid for payment of same.

56. Defendants knowingly enrolled and certified non-qualifying patients for skilled nursing and knowingly planned and ordered such care for patients who were not suited for such care and did not qualify for Medicare of Medicaid reimbursement and presented or caused to be presented false claims to the United States through Medicare or Medicaid for payment of same.

57. The Government paid Defendants for such false claims.

58. Defendants, in concert with their principals, agents, employees, subsidiaries, and other institutions did agree to submit such false claims to the United States.

59.    Defendants and its principals, agents, and employees acted, by and through the conduct described *supra*, with the intent to defraud the United States by submitting false claims for payment to the United States through Medicare or Medicaid.

60.    Defendants' fraudulent actions, together with the fraudulent actions of its principals, agents and employees, have resulted in damage to the United States equal to the amount paid by the United States to Defendants and others as a result of Defendants' fraudulent claims.

WHEREFORE, Plaintiff-Relators demand judgment in their favor on behalf of the United States and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 21 U.S.C. § 3729, attorneys' fees, costs, interest, and such other, different, or further relief to which Plaintiff-Relators may be entitled.

## COUNT FIVE
## SUPPRESSION, FRAUD, AND DECEIT

61.    Plaintiff-Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

62.    Defendants misrepresented or suppressed the material fact that a substantial number of their patients enrolled in Hospice do not qualify for Hospice and are not terminally ill.

63.    Defendants were legally obligated to communicate to the United States that they had enrolled patients to Hospice and that they had billed the United States for services to patients who do not qualify for Hospice and who are terminally ill.

64.    Such misrepresentations were made willfully to deceive or recklessly without knowledge.

65.    The United States acted on Defendants' material misrepresentations described herein to its detriment.

66.    Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid by the United States to Defendants and others as a result of Defendants' fraudulent claims.

WHEREFORE, Plaintiff-Relators demand judgment in their favor on behalf of the United States and against Defendants pursuant to 31 U.S.C. § 3732 and Ala. Code §§ 6-5-101, 6-5-102, and 6-5-103 in an amount sufficient to compensate the United States for Defendant's fraud, suppression, and deceit, together with punitive damages in an amount calculated to deter Defendant from engaging in such conduct in the future, along with attorneys' fees, costs, interest, and any other, further, or different relief to which Plaintiff-Relators may be entitled.

Date:  March 27, 2009.

_____

HENRY I FROHSIN
JAMES F. BARGER, JR.
J. ELLIOTT WALTHALL

Attorneys for Plaintiff-Relators
Dawn Richardson & Marsha Brown

**OF COUNSEL**

FROHSIN & BARGER, LLC
One Highland Place, Suite 310
2151 Highland Avenue
Birmingham, Alabama 35205
Tel:   205.933.4006
Fax:   205.933.4008

**RELATOR DEMANDS A TRIAL BY STRUCK JURY**

On this the 27th day of March, 2009, Plaintiff-Relators hereby certify that in compliance with Federal Rule 4 of the Civil Rules of Procedure, service of the *Qui Tam* Complaint has been executed as follows:

**By Hand-Delivery to:**

United States Attorney, Alice H. Martin
Attn:  AUSA Lloyd C. Peebles
1801 Fourth Avenue North
Birmingham, AL 35203


**By Certified Mail to:**

Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

EXHIBIT  A

asera care
hospice

# Increase Your Census!

How to Convert "Info Visits" into Admissions

by:

Peggy Durkin, RVP

asera care
hospice

# Good News, Bad News

- Good news
  - Consumer calls up
  - Awareness up
- Bad news
  - "Info only" visit = 2nd class status
  - Lower conversion rate
  - *Compromised mission*

asera care
hospice

# Our Goal

- The split visit model
- Getting over "not ready yet"
- Advocacy!



# The Change

## Old Model

- Describe program
- Us focus
- Explain benefit
- Offer choice
- Only a nurse

## New Model

- Identify need
- Them focus
- Relevant only
- Advocate!
- Rep = reporter

aseracare
hospice



# Opening Phrases

- Goal: Help, not history
- Traditional openers
  - What's been happening
  - What have you been told
  - What do you know about hospice
- The right opener
  - Goals/needs/concerns
  - *From today forward*

asera care
hospice





# "5 Second Nutshell"

- Hospice is a patient and family support service that...
  - Keeps the patient comfortable
  - Teaches the family to provide care
  - Offers emotional, spiritual support

aseracare
hospice

# Can't Decide?

- Key phrases
  - While you're thinking about it
  - Just for a few days
  - At least you'll be covered at night
- <u>Advocate</u>
  - Try us
  - Your doctor wants the best

aseracare
hospice

# More Tips

- <u>Team focus</u>
  - Support services
  - Chaplain not an option
- Stop!
  - Data dumping ("wehaveitis")
  - Hospicebabble
- <u>Listen for the yes</u>
  - Thank them!

aseracare hospice

# Time Management

- Watch the watch
- Focus families
  - "We only have 10 minutes left"
  - "We can't solve everything today"



asera care
hospice

asera care
hospice

# Words of Wisdom

Effective communication is the
_transfer of emotion, not information._

Want to further our mission?

_Focus on them, not us._